609 So.2d 348 (1992)
J.P. STEGALL
v.
WTWV, INC., a Mississippi Corporation, and Catherine (Cathy) Coggin Nash.
No. 89-CA-0333.
Supreme Court of Mississippi.
June 10, 1992.
As Modified on Denial of Rehearing December 10, 1992.
Dissenting Opinion on Denial of Rehearing December 10, 1992.
Roy O. Parker, Roy O. Parker, Jr., Roy O. Parker & Associates, Tupelo, for appellant.
Guy W. Mitchell, III, Donna M. Barnes, Mitchell McNutt Threadgill Smith & Sams, Tupelo, and Florence Snyder Rivas, Milledge & Iden, Palm Beach, Fla., for appellee.
Terryl K. Rushing, Leonard D. Van Slyke, Jr., Thomas Price Alston Jones & Davis, John C. Henegan, E. Marcus Wiggs, *349 III, W. Wayne Drinkwater, Jr., Butler Snow O'Mara Stevens & Cannada, Jackson, Thomas Wicker, Holland Ray & Upchurch, Tupelo, Henry Laird, Mize Blass Lenoir & Laird, Gulfport, and Luther T. Munford, and John P. Sneed, Helps Dunbar Firm, Jackson, for amicus curiae.
Before HAWKINS, P.J., and PITTMAN and BANKS, JJ.
Dissenting Opinion of Presiding Justice Hawkins on Denial of Rehearing December 10, 1992.
PITTMAN, Justice, for the Court:
J.P. Stegall, of Pontotoc County, Mississippi, commenced this action on December 2, 1987, alleging that Cathy Coggin, a WTWV reporter, and WTWV, Inc., a television station broadcasting over Channel Nine in Northeast Mississippi, had willfully, maliciously, and knowingly issued a false broadcast on August 4, 1987, during the evening newscast regarding Stegall. Summary judgment was granted in favor of WTWV and Coggin by Judge Thomas J. Gardner, III, of the Lee County Circuit Court. Because the trial court's summary judgment was error, we reverse and remand for further proceedings.

I.
August 4, 1987, was a primary election day. J.P. Stegall was a candidate for District 5 Supervisor in Pontotoc County, Mississippi. The holder of the District 5 position had been Stegall's cousin, Bobby Dean Stegall. Bobby Dean Stegall vacated the position after being arrested and indicted during the FBI undercover investigation of corrupt county purchasing practices in Mississippi. A WTWV news reporter, Catherine Coggin, was covering the race. WTWV was relaying information about more than 380 races in 27 counties.
Stegall submitted three affidavits of Mary Evelyn Jones, a deputy circuit clerk in Pontotoc County, wherein Mary Evelyn Jones stated that she received a phone call at the courthouse from Coggin on the afternoon of the primary election around 12:30 p.m. Mary Evelyn Jones stated the caller "identified herself as Cathy Coggin of Nine Alive News". Mary Evelyn Jones stated that she recognized the voice to be that of Coggin because the two had spoken several times before, including a conversation only a few days before the election day. Mary Evelyn Jones said the caller "was definitely Cathy Coggin". Mary Evelyn Jones claimed that Coggin wanted a list of all candidates running for all elections and that Mary Evelyn Jones gave her all the names and identified the incumbents in various races. According to Mary Evelyn Jones, when she reached the supervisors' races, Coggin asked about indictments on all incumbents. Mary Evelyn Jones claims that she then gave Coggin the names of candidates running in the Fifth District and that when she stated the name of J.P. Stegall as a candidate in that race, Coggin said that he was an incumbent and had been indicted. Mary Evelyn Jones said, "No, Mam [sic], I don't know if they are related or not, but Bobby Dean Stegall was the supervisor who was indicted and resigned from office." Mary Evelyn Jones claims that she completed the listing and that Coggin again asked if J.P. Stegall was the incumbent to which Mary Evelyn Jones again replied, "No."
WTWV and Coggin asserted that Coggin never called Mary Evelyn Jones or anyone at the Pontotoc County Circuit Clerk's Office on August 4, 1987. Coggin gave deposition testimony and signed an affidavit to that effect, and WTWV General Manager Mark Ledbetter supplied a WATTS line log of long distance telephone calls made from WTWV as well as the South Central Bell telephone bill. Both documents reflected that no long distance call to the Pontotoc County Circuit Clerk's Office was made on August 4, 1987.
Coggin arrived at work at the television station around 2:00 p.m. Coggin discussed the Pontotoc County supervisors' races with the news assignment editor, Kristie Blaes. WTWV and Coggin claim that Coggin misunderstood Blaes and confused the two Stegall cousins. Kristie Blaes gave deposition testimony that she told Coggin "a Stegall" who had been District 5 supervisor of Pontotoc County had been arrested in Operation Pretense and had resigned from office. Coggin could not explain where she arrived at the name "J.P. Stegall". *350 Kristie Blaes said that she knew about the FBI probe and arrests because of a phone conversation with U.S. Attorney Robert Whitwell sometime in the past. Coggin took notes during her meeting with Kristie Blaes.
Precinct polls were scheduled to close at 7:00 p.m. According to Stegall, Coggin aired the false broadcast over the 6:00 p.m. WTWV news broadcast. According to WTWV and Coggin, the false statement was broadcast over the live election coverage which began at 7:00 p.m. after the polls closed. The false broadcast went as follows:
J.P. Stegall was also arrested in the FBI undercover probe of corrupt county purchasing practices. Stegall pled guilty to alleged wrongdoing and he pulled out of the race. So in supervisor District 5 of Pontotoc County, Charlie Gray, W.C. Matthews and Billy Simmons are vying for that position.
Coggin agreed that this account of the broadcast over WTWV was basically what she said on August 4, 1987. Coggin made the broadcast while reading from her own notes made while talking to Kristie Blaes. She later threw her notes away.
After the false statement broadcast by WTWV, Stegall survived the primary election and qualified for the run-off election.
According to Stegall's brief, his wife called the station that evening to inform them of the falsity, and Stegall called the station himself the next day. According to WTWV and Coggin, Stegall's wife never called. WTWV and Coggin claim that they did not hear from the Stegalls until the morning following the broadcast when Stegall called Kristie Blaes and informed her of the error. WTWV broadcast a retraction on the noon and 6:00 p.m. broadcasts the day after the false statement. WTWV and Coggin claim that the noon retraction announced:
Last night we made an error in reporting the Pontotoc District Five supervisor race. We stated that candidate J.P. Stegall resigned from the race following the Federal Operation Pretense Probe. But in fact it was Bobby Dean Stegall who resigned earlier this year. J.P. Stegall is in the run-off election against Billy Simmons. And once again, J.P. Stegall is not involved in the Operation Pretense Probe.
WTWV and Coggin claim that the 6:00 p.m. retraction announced:
And in the race for Supervisor District Five in Pontotoc County, there will be a run-off between J.P. Stegall and Billy Simmons. We mentioned last night that Mr. Stegall pulled out of this race following an Operation Pretense Probe. That was an error. That reference should have been made to Bobby Dean Stegall, who was investigated, and who was the incumbent Supervisor for District Five.
Stegall has not disputed any rendition of the retraction.
In spite of the retraction, Stegall lost the run-off election of the second primary.

II.
Stegall claims that the lower court's summary judgment was erroneous because the court decided material issues of fact in making its ruling. Stegall additionally asserts that the direct contradiction between the testimony of Mary Evelyn Jones and the testimony of Coggin creates a genuine issue of material fact as to actual malice on the part of Coggin and/or WTWV.
This Court conducts de novo review of a lower court's grant of summary judgment. Short v. Columbus Rubber and Gasket Co., 535 So.2d 61, 63 (Miss. 1988). The question presented is whether there are issues of material fact which should have precluded the granting of summary judgment. This Court does not resolve disputed issues of fact. Mississippi Road Supply Co. v. Zurich-American Insurance Co., 501 So.2d 412, 414 (Miss. 1987). In Mink v. Andrew Jackson Casualty Insurance Co., 537 So.2d 431, 432 (Miss. 1988), this Court admonished trial courts to make use of summary judgments with "great caution" and further stated:
It is also important to note that Rule 56 requires that before a summary judgment can be granted there must be no *351 genuine issue of "material" fact. The question then becomes, what is a "material" fact? This Court has recently held that a material fact "tends to resolve any of the issues, properly raised by the parties." .. . This means that if a "material" fact or facts are present in the case, summary judgment should not be granted.
Id. at 433 (citation omitted).
The role of this Court is to make the determination of whether there are material facts which would preclude the granting of summary judgment; it is not this Court's function to try these disputed issues of fact. Mink, 537 So.2d at 433; Pope v. Schroeder, 512 So.2d 905, 908 (Miss. 1987); Mississippi Road Supply Co., 501 So.2d at 414. Determination of whether reasonable minds could differ on an issue is a question for the trial judge; a plaintiff is entitled to have a jury decide his claim if reasonable minds could differ. Stamps v. Estate of Watts, 528 So.2d 812, 815 (Miss. 1988). There are material facts in dispute in the case at bar which would preclude the granting of summary judgment.
There is dispute as to material facts which would warrant a full jury trial. First, the parties are in dispute as to the time of the false broadcast. Stegall claims that the false statement was made during the 6:00 p.m. news, before the polls closed. WTWV and Coggin claim that the false statement was broadcast during the election coverage which began after the polls closed at 7:00 p.m. This factual dispute, which might influence an award of damages, must be resolved by a jury. Second, the parties are in dispute as to when Stegall informed personnel at the television station about the false statement. Stegall claims that his wife called the station on the evening of August 4, 1987, immediately following the broadcast, and that he called the station himself the next morning. WTWV and Coggin claim that they were not informed of the mistake by the Stegalls until the next morning when Stegall called Kristie Blaes. This factual dispute could also influence an award of damages because the promptness of the retraction may be a factual issue at trial. This dispute must also be resolved by a jury. Third, as previously noted, there is a factual dispute as to whether Coggin made a phone call to Mary Evelyn Jones around 12:30 p.m. on August 4, 1987. Stegall, through affidavits of Mary Evelyn Jones, claims that Coggin called the courthouse to check her information. Coggin, through her own denials, claims that she did not call the courthouse. WTWV presented long distance telephone logs and bills to support their claim that Coggin did not call the courthouse. We note Coggin's testimony that she did not arrive at work until around 2:00 p.m. on August 4 and that she could have made a 12:30 p.m. long distance call from a location other than the television station. This type of dispute must be resolved by a jury.

III.
Stegall made a showing of possible actual malice on the part of Coggin and WTWV.
Claims of defamation are actionable when the words employed have clearly been directed toward the plaintiff and when the defamation is clear and unmistakable from the words themselves and not the product of innuendo, speculation, or conjecture. Meridian Star, Inc. v. Williams, 549 So.2d 1332, 1334 (Miss. 1989); Johnson v. Delta-Democrat Publishing Co., 531 So.2d 811, 813 (Miss. 1988); Blake v. Gannett Co., 529 So.2d 595, 603 (Miss. 1988); Chatham v. Gulf Publishing Co., Inc., 502 So.2d 647, 650 (Miss. 1987); Fulton v. Mississippi Publishers Corp., 498 So.2d 1215, 1217 (Miss. 1986); Ferguson v. Watkins, 448 So.2d 271, 275 (Miss. 1984). In the case at bar, Coggin clearly stated "J.P. Stegall". And no innuendo, speculation, or conjecture is necessary in order to understand the negative implication of her broadcast. Stegall has an actionable claim of defamation. However, because free speech is guaranteed by the first amendment of the U.S. Constitution, public officials and public figures who bring a libel action can only prevail by proving through clear and convincing evidence that the publisher *352 acted with "actual malice". New York Times Co. v. Sullivan, 376 U.S. 254, 279-283, 84 S.Ct. 710, 725-728, 11 L.Ed.2d 686, 706-709 (1964). Since Stegall was a candidate for public office, he was a public figure who must prove actual malice in order to prevail. See Monitor Patriot Co. v. Roy, 401 U.S. 265, 271, 91 S.Ct. 621, 625, 28 L.Ed.2d 35, 40 (1971); Newson v. Henry, 443 So.2d 817, 823 (Miss. 1983).
This Court has followed the U.S. Supreme Court and said that defendants in a libel or slander action are protected unless the public figure plaintiff shows malice by proving that the defendant when he published the words  (1) either knew they were false, or (2) published them in reckless disregard of whether true or not. Ferguson v. Watkins, 448 So.2d 271, 277 (Miss. 1984); Reaves v. Foster, 200 So.2d 453, 458-459 (Miss. 1967).
The U.S. Supreme Court has adopted as a summary judgment standard in libel actions the requirement that the trial court must be guided by the New York Times "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists. The evidence must be such that a reasonable jury might find that actual malice had been shown with convincing clarity. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-2511, 91 L.Ed.2d 202, 212 (1986); Johnson v. Delta-Democrat Publishing Co., 531 So.2d 811, 815 (Miss. 1988). The appropriate summary judgment question is whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not. Anderson, 477 U.S. at 255-256, 106 S.Ct. at 2513-2514, 91 L.Ed.2d at 216.
The evidence in the record sub judice could support a reasonable jury finding that Stegall has shown actual malice by clear and convincing evidence. If taken as true, the affidavit of Mary Evelyn Jones would show that Coggin knew the truth of Stegall's innocence or had been informed of the truth just a few hours prior to the broadcast. The jury must determine if this was because of her own disregard of the information. The trial judge ruled that no actual malice existed because Mary Evelyn Jones' affidavit was conflicting information for Coggin to analyze and consider and because Coggin relied on her memory. This conflict creates a jury issue. A reasonable juror hearing testimony from Mary Evelyn Jones could find that Coggin exhibited a reckless disregard for the truth rather than a misinterpretation of available information. If taken as true, the testimony of Mary Evelyn Jones would show that Coggin had specifically asked about an indictment of Stegall and was told more than once by Mary Evelyn Jones that Stegall had not been indicted. Coggin did not rely on her own memory. Coggin herself testified in depositions that she made notes.
It is clear that Coggin's actions might constitute actual malice, particularly if a jury found Mary Evelyn Jones' testimony to be true. Failing to make a sufficient inquiry as to whether someone had committed an act and then, without such inquiry, accusing him or her of stealing may exhibit that the accuser was in a frame of mind indicating that he or she did not care whether the words spoken were true or not. Coggin's actions could be interpreted by a juror to constitute this malice. Since Coggin did not check the story's authenticity, a juror could find that she simply didn't care about its truthfulness or intended to make false statements about Stegall.
Further, the trial court, noting that Mary Evelyn Jones amended and supplemented her affidavit twice and that WTWV's General Manager submitted long distance records to refute the affidavits, seemed not to place importance on Mary Evelyn Jones' affidavits and found that Stegall did not create a genuine issue of fact as to actual malice on the part of Coggin. The trial court did not believe that the affidavits of Mary Evelyn Jones were of sufficient weight and credence, and the trial court did believe the denial by Coggin of any call to be sufficient. This was error by the trial judge. The credibility of any testimony by Mary Evelyn Jones is a determination to be made by a jury. Credibility determinations, *353 the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge when he is ruling on a motion for summary judgment. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216; see also James v. Mabus, 574 So.2d 596, 600 (Miss. 1990).
It is not the intent of this Court to decide nor to imply that we find one witness credible at the expense of another. We simply note that credibility must be determined by the jury.

IV.
The case sub judice is remanded for a full trial on the merits due to the existence of genuine dispute of material facts and due to the existence of possible actual malice on the part of WTWV and Coggin.
REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.

ON PETITION FOR REHEARING
HAWKINS, Presiding Justice, dissenting:
I would grant the petition and affirm the summary judgment dismissing the action.
Bobby Dean Stegall was elected supervisor of district number 5 in Pontotoc County in the 1983 general election. During the four-year period in which he served as supervisor, the Federal Bureau of Investigation investigated corrupt purchasing practices by supervisors in a number of Mississippi counties, including Pontotoc County. Bobby Dean Stegall was arrested and charged with a federal law violation, following which he resigned from public office.
J.P. Stegall, the plaintiff in this case and cousin of Bobby Dean Stegall, qualified as a candidate for supervisor of district number 5 in the 1987 Democratic primary.
August 4 was primary election day. On that day the defendant, WTWV, was covering and reporting information on approximately 380 races in 27 counties. Cathy Coggin was a reporter-announcer for the station. There is a dispute as to the time of day in which it took place, Stegall claiming it was during a 6:00 p.m. broadcast, and the defendants, WTWV and Coggin, claiming it was at the 7:00 p.m. broadcast after the polls had closed, but the following broadcast was aired by Coggin:
J.P. Stegall was also arrested in the FBI undercover probe of corrupt county purchasing practices. Stegall pled guilty to alleged wrongdoing and he pulled out of the race. So in supervisor district 5 of Pontotoc County, Charles Gray, W.C. Matthews and Billy Simmons are vying for that position.
This broadcast was inaccurate. Nevertheless, J.P. Stegall received enough votes to place him in the run-off in the second primary election for supervisor of District 5.
Either Stegall or his wife reported to the station the next day, August 5, that the previous day's broadcast was not true. At noon on August 5 WTWV and Coggin broadcast the following retraction:
Last night we made an error in reporting the Pontotoc District Five supervisor race. We stated that candidate J.P. Stegall resigned from the race following the Federal Operation Pretense Probe. But in fact it was Bobby Dean Stegall who resigned earlier this year. J.P. Stegall is in the run-off election against Billy Simmons. And once again, J.P. Stegall is not involved in the Operation Pretense Probe.
Again, at 6:00 p.m. on August 5 there was the following retraction broadcast:
And in the race for Supervisor District Five in Pontotoc County, there will be a run-off between J.P. Stegall and Billy Simmons. We mentioned last night that Mr. Stegall pulled out of this race following an Operation Pretense Probe. That was an error. That reference should have been made to Bobby Dean Stegall, *354 who was investigated, and who was the incumbent Supervisor for District Five.
Stegall was defeated in the run-off election with Simmons.
Stegall filed suit against WTWV and Coggin in the Lee County Circuit Court on December 2, 1987, for slander and defamation of character. Following discovery, the defendants made a motion for summary judgment. In resisting this motion, Stegall filed the affidavit of Mary Evelyn Jones, a former deputy circuit clerk of Pontotoc County.
According to this affidavit, Coggin telephoned her on August 4, asking for a list of all candidates running for all elections. When they came to the supervisors' races, according to Jones, Coggin asked about indictments on all incumbents. When they came to District 5, again according to Jones, she gave Coggin the name of J.P. Stegall as candidate, and Coggin said he was an incumbent and had been indicted. Jones corrected her, telling her that it was Bobby Dean Stegall who had been indicted and resigned from office.
Coggin, on the other hand, swore that at the time of her broadcast, she had no knowledge of her error, and it was not until Stegall telephoned the next day that she knew a mistake had been made.

LAW
The familiar standard for making a jury issue on libel of a public figure was again stated in Harte-Hanks, Inc. v. Connaughton, 491 U.S. 657, 659, 109 S.Ct. 2678, 2681, 105 L.Ed.2d 562, 571 (1989):
A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false "statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not." [citations omitted] ... In Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), we held that judges in such cases have a constitutional duty "to exercise independent judgment and determine whether the record established actual malice with convincing clarity."
Was "actual malice," as above defined, established sufficiently to survive the motion for summary judgment? As this Court noted in Reaves v. Foster, 200 So.2d 453, 458 (Miss. 1967), and again in Gulf Publishing Co. v. Lee, 434 So.2d 687 (Miss. 1983), state courts can neither "find," define nor pronounce the law governing libel of public figures, but can only tread water, trying to glean in each case whether the standards enunciated by the U.S. Supreme Court have been violated.
Under the familiar standard, "actual malice" is satisfied if the false statement was made (1) with knowledge that it was false, or (2) with reckless disregard of whether it was false or not.
If proposition (1) is satisfied, there need be no inquiry into (2). Number (2) would only apply if the reporter did not really know for sure whether the statement was false or not. There is no proof of Number (2) in this case. Stegall has a plausible argument from the affidavit of Mary Evelyn Jones that Coggin in fact knew that J.P. Stegall was not the person who had been arrested and indicted for corrupt county practices, but it was Bobby Dean Stegall.
The inquiry cannot stop there, however. Did Coggin deliberately tell a lie about Stegall? Has this been shown by clear and convincing evidence? Stegall cannot prevail if Coggin made a mistake. Only if he shows that in her mind she knew she was making a false statement can he be successful. Coggin did not know Stegall. The station was covering 380 races in 27 counties.
The uncontradicted evidence is that the next morning after the broadcast, as soon as the error was called to the station's attention, twice that very day the station broadcast a correction.
From this record one mistake was made in reporting 380 races. As exasperated as Stegall understandably would be, the proof falls short in showing that Coggin in fact knew she was naming the wrong Stegall, as opposed to making a mistake. She positively *355 testified that she was unaware she was making a mistake. If Coggin in fact knew the statement was false, then, of course, there would have been some malice on her part in making it, but if there had been any animus or ill will whatever connected to the erroneous broadcast, it is highly unlikely the station would have taken such prompt steps to correct the error. The subsequent conduct of the defendants is entirely consistent with an honest, though careless mistake having been made, and inconsistent with any intent to cause Stegall harm.
Stegall's case is based solely on this one conversation between Jones and Coggin. There is no pattern of events leading us to conclude one thing or another; there is no evidence of personal ill will of any of the WTWV reporters or the station against J.P. Stegall as was the case in Harte-Hanks, Inc.
As stated in Bose, 466 U.S. at 415, 104 S.Ct. at 1872, 80 L.Ed.2d at 526, in a case as this, "Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity."
The question is whether Jones' affidavit established by "clear and convincing evidence" that Coggin in fact knew when she made the broadcast that she was naming the wrong Stegall as opposed to negligence or carelessness.
Gulf Publishing Co. v. Lee, 434 So.2d 687, 697 (Miss. 1983) tells us that under this standard, the answer is no. While that case involved a statement far less damaging to the plaintiffs' reputation  in fact presented a serious question of whether it was libelous at all  it is on point with this case as to whether or not the reporter knew the statement to be false. In Lee two individuals had informed the reporter that what he later wrote was in fact not true. Also in that case, the reporter, after the story was published, recognized he had made a mistake, reported it to his editor, and the newspaper took steps to correct the article in a subsequent edition. In this case steps were also promptly taken to correct the name of the supervisor involved.
In reversing and rendering the judgment for the plaintiffs, we held:
The evidence in this case shows that immediately after his afternoon conversation with Lee, Bean told his superior that he thought he had "messed up." This evidenced a state of mind contrary to any supposition that when he submitted the article for publication he either knew or seriously doubted that it was false. The proof also shows that following this conversation the newspaper and Bean took every reasonable step to correct any error in the article, insofar as any implication against the plaintiffs were concerned.
Id. at 697.
In Long v. Arcell, 618 F.2d 1145 (5th Cir.1980), a Biloxi newspaper had published that Long's ambulance service, "Pas-Point Ambulance Service," "may have violated law" in operating without having obtained a license. The ambulance company's attorney, William Roberts Wilson, claimed that he read to the reporter prior to publication a letter from a field representative of the State Board of Health, which stated that the ambulance service was authorized to operate the ambulances. This conversation was denied by the reporter. Following a jury verdict in favor of the plaintiffs, the district court entered a J.N.O.V. for the defendants. The Court of Appeals affirmed, stating:
The plaintiffs' case rested almost entirely on the testimony of Bradshaw and Wilson. Theirs was the only testimony relating directly the defendant's state of mind. There was no documentary evidence which showed that the defendants knew their article was false or entertained serious doubts about its accuracy. In sum, the jury was left to decide the case based on the conflicting accounts of the conversations described above. If the applicable burden of proof had been a preponderance of the evidence, a jury verdict either way would have to stand. Similarly, if liability could be imposed on a clear and convincing showing of negligence, we would be hard pressed to disregard the jury's verdict. We repeat, *356 however, that the plaintiff's burden was to prove actual malice by clear and convincing evidence. This record simply does not contain clear and convincing evidence that the defendants knew that their information was incorrect or had a "high degree of awareness of ... [its] probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). (Emphasis added)
Although the Constitution neither condones nor encourages careless journalistic practices, the journalist who merely is careless may not be held liable for defaming a public figure. That is because the interests we must consider in libel cases are not only those of the defamed and the defamer. If they were, the former would prevail with a greater degree of frequency. In all libel suits between a public figure and a publisher the public intervenes as a matter of right, and its interest must be considered. Only by limiting liability to those situations in which the publisher has acted with actual malice do we fully protect the public's right to the benefits of a free and uncensored press.
618 F.2d at 1148-49.
In Ocala Star-Banner Company, et al. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971), the newspaper printed a story that Leonard Damron, a town mayor and candidate for county tax assessor, had been charged in federal court with perjury. This story was false. Leonard Damron had not been charged with any crime in federal court, but instead it was his brother, James Damron.
The editor, who had been with the paper about a month, explained the reason for the error was that he had been writing articles about Leonard Damron, the candidate, and when the reporter telephoned the story about James Damron being charged with perjury, he inadvertently changed the name. Leonard Damron presented evidence tending to cast doubt on this explanation. A judgment in favor of Leonard Damron was affirmed in the Florida Supreme Court. The U.S. Supreme Court granted certiorari, and reversed because the Florida courts had not used the proper standard for instructing the jury. When the case was remanded to the Florida State courts, the circuit court granted summary judgment in favor of the defendants. The District Court of Appeal affirmed, Damron v. Ocala Star-Banner Co., 263 So.2d 291 (Fla. 1972).
In this case has it been established by clear and convincing evidence (which is about the same as saying beyond a reasonable doubt) that Jones did in fact talk with Coggin on the telephone?
Has it been established by clear and convincing evidence that when Coggin used the name J.P. Stegall in her broadcast she in fact knew she was giving the name of the wrong Stegall, that in fact she was talking about Bobby Dean Stegall?
Why would she want to tell a lie?
While the federal courts make it very clear that animus or ill will towards the slandered person in and of itself will not make a false statement "malicious" under the Constitution, when the reverse is true, as in this case, that there was no showing of ill will, they take the absence as a factor into consideration in determining that there was no malice. Long v. Arcell; Gulf Publishing Co. v. Lee; Damron v. Ocala Star-Banner Co.
What does the record show thus far about Coggin's state of mind? Nothing.
It is certainly understandable that any candidate for public office would be upset having a false statement about himself broadcast as was done in this case, but we eviscerate the First Amendment protection as delineated in United States Supreme Court decisions to hold a jury issue on slander was made on the record before us. The kind of mistake made here, though regrettable, can by simple negligence, misunderstanding or oversight occur with any television announcer covering a number of political races on election night.
I would grant the petition and affirm.
JOINED by ROY NOBLE LEE, C.J., and PRATHER, J.